## Bugh's Estate.

*Mortgage—Bid at sheriff's sale—Amount due on bond—Deficiency—Trusts and trustees.*

1. A bid by a mortgagee at a sheriff's sale under foreclosure proceedings on a mortgage at which the mortgagee becomes the purchaser is not conclusive in the bankruptcy courts in determining what deficiency may be recovered on the bond.

2. In such case, the true value of the mortgaged property acquired by the mortgagee may be shown to reduce the claim.

3. Where a trustee of a mortgagee buys in the mortgaged property in foreclosure proceedings at a nominal sum and it appears that the mortgagor is a bankrupt, and the trustee, although a party to the bankruptcy proceedings, neglects to present a claim on the bond before the referee, he will not be surcharged with a dividend on the principal of the mortgage if it appears that the property was worth the mortgage; but he will be surcharged with a dividend on expenses of foreclosure, carrying charges and loss of income which he might have recovered if a claim had been presented, so as to reimburse the trust estate for the losses sustained on these items.

*Trusts and trustees—Holding of real estate—Failure to sell or rent.*

4. Where a trustee buys in property in foreclosure proceedings on a mortgage, it is his duty to sell the property to the best advantage and turn it back into personalty, and not to hold it as an investment; but he will not be surcharged for failure to sell or failure to rent pending sale where he makes reasonable efforts to sell and in fact makes a sale within two years for an amount equal to the mortgage.

Exceptions to adjudication. O. C. Phila. Co., Jan. T., 1900, No. 103.

VAN DUSEN, J., Auditing Judge.— . . . James L. Bugh died Dec. 11, 1898, leaving his last will duly probated, whereby, *inter alia*, he bequeathed to the accountant $50,000 in trust to pay the income to his nieces, Julia L. Tressler and Sarah Bugh Tressler, in equal shares during their lives, and upon the death of either to pay one-half of the *corpus* to the children and issue of deceased children of the one so dying, in equal shares, *per stirpes;* and in the event of the death of either of them without leaving issue her surviving, to pay the whole of the income to the survivor for life, and after the death of the survivor to pay the whole of the *corpus* to the children and issue of the deceased children of the survivor, *per stirpes*, with further provision in the event of the death of both of them without issue surviving, not necessary to recite.

Sarah Bugh Tressler died Dec. 3, 1902, intestate, unmarried and without issue. Julia L. Tressler, now Fickinger, the surviving life-tenant, died March 2, 1927, wherefore the trust is now terminated and the balance of *corpus* and income is distributable to her children, William T. Fickinger, Charles F. Fickinger, James Laird Fickinger and Frank Evans Fickinger, in equal shares, the last named of whom is a minor, of whose estate the Sewickley Valley Trust Company of Allegheny County, Pennsylvania, is guardian. . . .

Certain surcharges on the accountant were requested. On behalf of the remainderman:

1. The trustee held a mortgage of $12,000 on premises No. 121 South 41st Street. This was foreclosed and the property bought at sheriff's sale by the trustee March 12, 1917, for $50. The obligor in the bond which accompanied the mortgage went into bankruptcy, and his estate paid total dividends of 19.8 per cent. No claim on the bond was presented by the trustee, though in two letters to the beneficiary it said it would do so. If it had presented a claim for the full amount of the judgment, less the sheriff's bid, viz., $12,763.05, and the claim had been allowed, it would have got a dividend of 6.4 per cent. or $2093.14. It was claimed that the failure to make such a claim was negligent and resulted in a loss of $2093.14 to the estate.

Bugh's Estate.

It appears that the bankruptcy courts take the position that the sheriff's bid is not conclusive in determining what deficiency may be recovered on the bond (Dix's Estate, 176 Fed. Repr. 582; Winter's Appeal, 174 Fed. Repr. 556), but that the true value of the mortgaged property may be shown to reduce the claim. There is no testimony from which an accurate finding could be made as to the true value of the property at the time of the sheriff's sale, but as it was assessed for $15,000 and brought $12,000 when sold by the trustee April 29, 1919, two years later, and the objector claims that it was always worth more, we may safely conclude that it was worth at least the amount of the mortgage.

The trustee knew of the bankruptcy and proposed to make a claim, and the failure to do so was an inexcusable oversight. The ascertainment of the loss which resulted is a matter of some uncertainty, for it involves a speculation as to the amount in which the claim would have been allowed. However, an attempt should be made with the best materials at hand.

The original principal of $12,000 was restored by resale, and it seems probable that no more than that amount should be credited as the value of the property as against the bond. Principal was not recouped for the costs of acquiring the property, however, which appear in the account charged to principal, as follows:

| | |
|---|---:|
| Costs of foreclosure | $439.33 |
| Costs of foreclosure | .50 |
| Taxes, 1916 | 285.35 |
| Water rent, 1916 | 24.15 |
| | $749.33 |

The expenses of resale were not then known. A loss of interest also was known in time to present to the bankruptcy court for the benefit of income of at least two years from June 2, 1916 (last dividend in bankruptcy was declared Oct. 8, 1918), which, at 5 per cent. (the rate then paid), would be $1200.

To this should be added the expense of carrying the property for 1917 and half of 1918, as follows:

| | | |
|---|---:|---:|
| Water rent, 1917 | | $21.00 |
| Taxes, 1917 | | 262.50 |
| Removing snow | | 12.00 |
| ½ taxes, 1918 ($348.98) | | 174.49 |
| Insurance | $44.00 | |
| Less return premium | 24.09 | |
| | | 19.91 |
| | | $489.90 |

a total loss to income of $1689.90.

If the proved claims, $62,568.03, are increased by loss to principal, $749.33, loss to income, $1689.90, a total of $65,008.26, the amount available for dividends, $12,374.08, would have yielded 19 per cent., and principal would have recovered $142.37 and income $321.08.

I arrive at this result with some hesitation because of the uncertain factors, but I believe it does the trustee no injustice, in view of its expressions of intention to present a claim in bankruptcy and failure to do so, and I think the result is sufficiently certain. This claim is sustained in the amount of

$142.37, and the accountant is surcharged with that sum. The item of $321.08 is dealt with below.

2. Loss of $3000 to principal by resale of No. 121 South 41st Street for $12,000, April 29, 1918, when its fair value was $15,000.

This property had been for sale for two years, and the real estate officer of the accountant had brought it to the attention of real estate dealers on many occasions. The sign of a competent local real estate agent had been on it for a year. He never had an offer. In January, and again in October, 1918, it had been offered for sale at auction by Samuel T. Freeman & Co. No bids were received. Finally, the original owner offered $10,000, and increased by degrees to $12,000, and it was sold to him at that price. The price was not tested by consulting any dealer or person outside the accountant company, but was accepted on the general knowledge of the officers of the accountant relating to this specific property. In view of its history, there must have been a feeling of relief that it had moved at last, and surprise at the present claim that it was then and always worth more.

The local real estate agent, who testified for the objector and had had the property in charge for the accountant, testified to a value of $15,000 at the time of sale. The real estate officer of the accountant valued it at $15,000 in 1915. Two experts, one of whom was the succeeding real estate officer of the accountant, testified to a value of $12,000. The striking fact remains that no one in two years, and after adequate efforts, had produced any offer at all. Is it to be wondered that the trustee took the offer which would nearly let principal out whole? And is it to be surcharged because an expert later (who, however, had got no offer himself) testifies to a higher value? This would put too great a burden on trustees. That property soon boomed, or started to boom, is nothing. A corporate trustee is not bound to know everything, but is to be tested as an ordinary man. The trustee cannot be convicted of negligence under the circumstances, and the objection is dismissed.

Requests to surcharge were presented on behalf of the life-tenant, now deceased:

3. Loss of income on the amount of the surcharge for failure to present the claim in bankruptcy, 5 per cent. on $2093.14, from Oct. 8, 1918 (the date of the last dividend), to March 2, 1927. As the surcharge has been allowed in the sum of $142.37, interest at 5 per cent. is allowed to the life-tenant from Oct. 8, 1918, to March 2, 1927, or $59.85, and the accountant is surcharged with that amount. The effect of the life-tenant's receipts, etc., is discussed below.

4. Loss of income on the requested surcharge of $3000 for failure to resell at an adequate price, 5 per cent. from June 16, 1919 (the date of settlement on resale), and March 2, 1927. As the surcharge on account of principal has been refused, this request is refused.

5. Loss of rental from premises No. 121 South 41st Street from April, 1917, to April, 1919, at $100 per month for the first year and $125 per month for the second year, a total of $2700. On this claim should be credited, in any event, the surcharge of $321.08, calculated above and allowed below, which it is found might have been recovered from the bankrupt estate.

It was undoubtedly the primary duty of the trustee to sell the property to the best advantage and turn it back into personalty, and not to hold it as an investment. The objector's real estate expert testified that it should have been kept untenanted for six months, until October, 1917, while an attempt was made to sell; and that it could then have been rented at $125 per month for one year and $150 per month on yearly lease from October, 1918. He also

Bugh's Estate.

said that the house required little expenditure to adapt it for renting and there was great demand for this sort of house for Hog Island workers, who had good trolley service to that neighborhood, beginning, say, October, 1917. Also, that the existence of a lease would unfavorably affect the sale of the property, as "they never buy such properties for investment," but that a lease, terminable on sixty days' notice, would not be unfavorable, and that for such a lease $100 per month could have been obtained from October, 1917, to June, 1919. In view of the duty to sell, no longer lease should have been made, and the claim should be not more than twenty months at $100, or $2000, in any event.

Testimony for the accountant was that the house was old-fashioned and would require the expenditure of thousands of dollars to adapt it for rental, though no detailed estimate was obtained for this. Also, that it was in a neighborhood where colored people had come in, and a large car-barn converted into a dump-truck garage, and other unfavorable features, made the property undesirable and its use problematical. Proper effort was made to sell; none was made to rent.

Here again it was a matter for the judgment of the trustee. It is not called upon to be right, but only to try diligently and honestly to be right. I do not have to determine whether the policy of not renting produced the best results, as things afterward turned out, but whether what the trustee did had some reason in it. I think that it had. Any lease at any rent might have been a detriment. It is strange, if houses were in such demand, that this big empty house with a "for sale" sign on it did not attract an offer. None was received. The request to surcharge on this account is refused.

6. The accountant is surcharged with $321.08 loss to income by reason of failure to make claim in bankruptcy, discussed above. I think the representatives of the life-tenant are entitled to this item, in spite of the fact that she received statements of account, and receipted for income in each year, with a "thank you," and failed to make any such claim in her lifetime.

I am not referred to any authority which holds that the receipt of an account by a beneficiary from a trustee, and the acceptance of a balance shown thereby, is, without more, a waiver of complaints. In this particular case, the life-tenant, through her husband, made two long and detailed complaints. She was assured that a claim would be presented in bankruptcy, and she was asked (by the president of the accountant company) to let the matter rest until a resale showed whether there was a loss or not. She must have known that a resale had been made, but not that the bankruptcy was closed. At any rate, I do not think the general proposition is sound.

7. . . .

The account of income shows a balance of.............. $56,571.48
To which add surcharge of loss of income by failure to
    present claim in bankruptcy......................... 321.08
Surcharge of loss of income on principal which might have
    been recovered in bankruptcy........................ 59.85

        Total ........................................$56,952.41

which, subject to the payment of so much thereof as accrued in the lifetime of Julia L. Tressler-Fickinger to the personal representatives of her estate, subject to payments on account thereof made to her in her lifetime, as set forth in the account, is awarded to William T. Fickinger, Charles F. Fickinger, James Laird Fickinger and Frank Evans Fickinger, in equal shares,

together with additional income to date of actual distribution; the award to the last named to be paid to the guardian of his estate.

The account of principal shows a balance of..............$48,721.67

To which add surcharge of principal which might have
been recovered in bankruptcy........................   142.37
                                                     _____

Making ......................................... $48,864.04

which, subject to the payment of collateral inheritance tax to the Commonwealth of Pennsylvania at the rate of 5 per cent., is awarded to William T. Fickinger, Charles F. Fickinger, James Laird Fickinger and Frank Evans Fickinger, in equal shares, the award to the last named to be paid to the guardian of his estate.

*Victor Frey* and *Daniel C. Donoghue,* for claimants.

*Carlyle H. Ross (Evans, Bayard & Frick* with him), for accountant.

THOMPSON, J., Nov. 4, 1927.—We are of the opinion that the Auditing Judge correctly decided the controverted questions of law and fact as set forth in his adjudication, and, for the reasons therein set forth, the exceptions filed by both the claimant and the accountant are dismissed, and the adjudication confirmed absolutely.

HENDERSON, J., absent.